## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **ALISHA HOSPITALITY, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-CV-0251-CVE-JFJ** |
| | ) | |
| **AMERICAN ZURICH INSURANCE** | ) | |
| **COMPANY,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Now before the Court are Defendant American Zurich Insurance Company's Motion for

Summary Judgment and Brief in Support (Dkt. # 59) and Defendant American Zurich Insurance

Company's Motion to Strike Portions of Jett McKay's and Pete Scaffidi's Declarations and Untimely

Submitted Pinnacle Estimate (Dkt. # 70).  This case arises out of an insurance claim filed by Alisha

Hospitality, Inc. (Alisha) following a windstorm on May 25, 2019.  Alisha's insurer, American

Zurich Insurance Company (Zurich),[2] argues that Alisha has failed to meet its burden to show that

the damages it seeks were proximately caused by the windstorm, rather than a 2017 tornado or

vandalism resulting from Alisha's failure to secure its property.  Dkt. # 59, at 5.  Alisha responds that

it had substantially completed its repairs to the interior of the property and some exterior repairs from

---

[1] The correct name of the defendant is American Zurich Insurance Company.  Dkt. ## 13, 57.
Plaintiff is directed to take note of the correct corporate identity of the named defendant and
identify the defendant as American Zurich Insurance Company in future filings in this case.

[2] Alisha had two separate insurance policies issued by Zurich affiliated entities, American
Zurich Insurance Company and Zurich American Insurance Company.  The defendant in this
case is American Zurich Insurance Company; Alisha's policy with Zurich American
Insurance Company is referenced as it pertains to the factual background of Alisha's claims.

the 2017 tornado before the windstorm occurred, and any vandalism at the property occurred after the May 29, 2019 windstorm.  Dkt. # 69, at 19-20.

## I.

Alisha owns a hotel located at 6030 East Skelly Drive in Tulsa, Oklahoma, and the property was covered by a commercial property insurance policy issued by Zurich American Insurance Company (Zurich American).  Dkt. # 68-1, at 1697.  The hotel suffered damage during a tornado on August 7, 2017, and Alisha filed a claim under the commercial property insurance policy.  Dkt. # 59, at 7; Dkt. # 68, at 6.  Zurich American retained Young and Associates (YA) as a consultant to inspect the property, and Zurich American issued payments of over $1,500,000[3] to allow Alisha to repair or replace damaged doors and windows, electrical equipment, air conditioners, plumbing, and the exterior of the hotel.  Dkt. # 59-16.  Alisha spent approximately $1,000,000 of the insurance proceeds to repair the property, but a substantial part of the insurance proceeds were used to pay the lease, make mortgage payments, and pay other fees not directly related to repair of the property.  Dkt. # 59-17.

Alisha subsequently purchased a builder's risk policy from Zurich for the property located at 6030 East Skelly Drive, and the policy initially went into effect on February 26, 2018.  Coverage under the policy covers the "risk of loss or damage from the time when you are legally responsible for the Covered Property on or after the effective date of this policy if all other conditions are met."  Dkt. # 59-1, at 14.  A "Covered Cause of Loss" is defined as the "risk of direct physical loss or damage to Covered Property except those causes of loss listed in Section **B. Exclusions**."  Id. at 7.

---

[3]     The parties agree that Zurich American issued a total payment of $1,869,772.85 for the tornado claim, but $1,513,324.30 was specifically designated for repairing the interior and exterior of the property.  Dkt. # 59, at 7; Dkt. # 68, at 6.

Most relevant to this case is the remodeler coverage, under which Zurich agreed to "pay for loss or damage due to a Covered Cause of Loss to 'existing buildings or structures' described in the Declarations to which 'renovations and improvements' are being made." Id. at 19.  The policy provides that Zurich will pay the "actual cash value," and the value of the renovations or improvements "will be the lesser of the cost to repair or the cost to replace with like kind and quality to the same point of completion that had been achieved immediately before the loss or damage." Id. Remodeler coverage contains an exclusion when there has been no ongoing construction activity for at least 60 days before the loss or damage occurs, and Zurich will not pay for any loss or damage caused by vandalism or water damage if this exclusion applies.  Id.  For other causes of loss not expressly listed in the exclusions to remodeler coverage, Zurich will reduce the amount it would otherwise pay for a covered loss by 15 percent if there has been no ongoing construction activity within 60 days of the loss.  Id. at 20.  The policy contains a separate exclusion for damage to the interior of a building caused by water damage from "rain, snow, sleet, ice, sand, or dust, whether driven by wind or not, unless . . . [t]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand, or dust enters . . . ." Id. at 12.

The parties do not dispute that the tornado damage to the hotel had not been fully repaired by May 2019.  In late December 2018, Zurich had requested that YA re-inspect the property to determine "the level of completed repairs and project status," but YA had difficulty making contact with the insured, Vipul Patel.  Dkt. # 68-1, at 1697.  YA performed an inspection of the ongoing repairs in January 2019, even though it was unable to make contact with Patel, and one of the contractors asked YA to wait for a representative of the insured, Dawn Price, to arrive before YA

3

proceeded with its inspection.  Id.  Price met with YA and YA proceeded with the inspection, and YA found that repairs were ongoing but substantially incomplete.  Id. at 1698.  Stucco work on the exterior of the hotel was in progress, but most of the doors and windows were covered with boards. Id.  A ground view of the roof showed that the roof was unsecured or unattached at the perimeter. Id.  No plumbing had been installed in the interior of the building, and there were minimal lighting or electrical fixtures installed on any of the four floors of the hotel.  Id.  No flooring had been installed on any the four floors of the hotel, and a few doors had been installed on the second through fourth floors.  Id.  Price spoke to Patel by telephone, and Price advised YA that Patel believed the repairs were about fifty percent complete.  Id.  According to Price, Patel estimated that the repairs would be completed in "August 2019 or 2020."  Id.

On June 10, 2019, Alisha filed a vandalism claim under the builder's risk policy with a reported  loss date of May 25, 2019, and Alisha claimed that "[v]andals damaged the interior finishes, plumbing, and electrical systems."  Dkt. # 59-19, at 2.  Alisha also made a claim for damage resulting from a windstorm that occurred on May 25, 2019, and Alisha reported the windstorm claim to Zurich on June 10, 2019.  Dkt. # 59, at 9; Dkt. # 68, at 7.  Before any insurance claim had been filed, Alisha retained a public insurance adjustor, Pinnacle Limited (Pinnacle), and Jett McKay, the president of Pinnacle, conducted an inspection of the property on May 29, 2019.  Dkt. # 68-1, at 9. McKay observed that the roof the of hotel had blown off during the storm from the west toward the center of the building, but the roof did not completely detach.  Id.  Alisha attempted to pull the thermoplastic polyolefin (TPO) roof back into place, but water was still entering the building  at several places.  Id.  McKay states that he saw "limited evidence of vandalism to certain building

components" during his initial inspection, but he saw evidence of attempted vandalism to copper pipes and the main electrical room.  Id. at 9-10.

Zurich opened an investigation after receiving the insurance claims, and conducted a site inspection on June 18, 2019.  Dkt. # 59, at 6; Dkt. # 68, at 7.  Zurich also retained Vertex Engineering (Vertex) as an engineering consultant and YA as a building consultant.  Id.  Zurich's initial inspection was conducted by Zac Lindley of Insurance Claims Adjustors, and McKay was present during the inspection.  Dkt. # 68-1, at 1716-1721.  Lindley noted that repairs to the interior of the property were "in the process of being completed," and the insured had just begun repairs to the exterior of the building.  Id. at 1717.  Lindley saw extensive evidence of vandalism and he believed that vagrants had been living in the hotel for some time.  Id.  Lindley recommended mitigation work to remove debris and stop ongoing vandalism, but Lindley's initial report was focused on Alisha's vandalism claim, not the damage caused by the windstorm.  Id. at 1720.  Lindley conducted a second inspection on July 29, 2019, and the evidence he had gathered since his initial inspection established that no construction work to the exterior of the property had taken place since January 2019.  Id. at 1723.  Lindley clarified that he had been asked to assess Alisha's vandalism loss as to copper plumbing and copper electrical components that had been removed, and other vandalism damage was being considered as part of the windstorm damage claim.  Id.  at 1724.  Lindley had met with Zurich's large loss adjustor, Bradley Dean, and had recommended that Zurich reserve between $200,000 and $300,000 to repair the vandalism within the scope of Lindley's investigation.  Id. at 1725.  However, he noted that there could be insurance coverage issues due to the length of time the building was unoccupied and the lack of construction activity at the property.  Id. at 1724.

YA conducted an inspection of the property on July 22, 2019. Dkt. # 59-6, at 1. YA noted that three separate insurance claims had been filed concerning the subject property, but it was assigned to assess only the damage attributable to the May 25, 2019 windstorm. Id. YA received an estimate from Pinnacle stating that it would take over $4.6 million to fully repair the property, but YA found that Pinnacle failed to consider what damage was actually caused by the 2017 tornado, vandalism, or the May 25, 2019 windstorm. Id. at 2. YA determined that damage to mechanical and plumbing items, doors and door frames, and drywall were covered and paid for in connection with the tornado claim, and the repairs to these items had not been completed at the time of the windstorm. Id. These items were not included in YA's estimate to repair damage caused by the windstorm. YA provided an estimate of $1,321,900.39 to resolve Alisha's insurance claim related to the May 25, 2019 windstorm to restore the property to its pre-loss condition. Id. at 1. YA specifically noted that it had received a mitigation estimate of $875,929.86 supplied by Unified Disaster Resources (UDR), but YA disagreed with the proposed cost of UDR's estimate and chose to submit a mitigation quote from another contractor. Id. at 2; Dkt. # 68-1, at 1738-40.

Zurich retained Vertex to inspect the "cause and extent of reported damage to the roof covering at the building and determine whether the conditions were attributable" to the May 25, 2019 windstorm. Dkt. # 59-7, at 3. Vertex conducted an initial investigation on August 13, 2019 and a second inspection on November 12, 2019, and McKay was present during the inspections. Id. The structure was covered by a TPO roof membrane at the time of the windstorm, but the metal parapet caps had not been installed around the perimeter of the roof due to ongoing work to the exterior of the building. Id. at 3-4. Vertex's inspectors, Josh Thompson and Shawn Hardy, determined that the nails used to secure the TPO roof to the structure were not adequate to withstand the uplift forces

6

caused by the wind, and this resulted in a cascading roof failure.  Id. at 6-7.  The roof failure permitted water to enter the building and the lack of a functioning HVAC system contributed to the severity of the damage inside the building.  Id. at 7.  Vertex recommended repairs to the temporary roof of the structure, replacement of damaged drywall, repair of bubbling and peeling paint, and installation of additional fasteners along the base of the temporary roof.  Id. at 8.  Vertex's report clearly states that it was not offering an opinion as to insurance coverage for any of the recommended repairs, and it had not reviewed Alisha's insurance policy.  Id.

On August 20, 2019, Zurich issued an advanced payment to Alisha in the amount of $203,685.75 for temporary repairs to the property, and Alisha completed the temporary repairs by October 3, 2019.  Dkt. # 59, at 9-10; Dkt. # 68, at 7.  However, the temporary repairs did not wholly prevent water from entering the building.  Dkt. # 59-7, at 7.  Zurich asked Vertex to conduct a microbial damage assessment to evaluate the water damage to the interior of the property and determine what repairs were necessary.  Dkt. # 59-8, at 3.  Vertex conducted an inspection on November 18, 2019 and found that much of the sheetrock in the interior of the building needed to be replaced.  Id. at 5.  Vertex observed visible mold growth (VMG) caused by ongoing water intrusions from the roof, as well as from the windstorm.  Id.  Vertex conducted a second inspection on December 4, 2020 in furtherance of the microbial damage assessment and did not find any significant difference in the amount of VMG between the two inspections.  Id. at 4-5.  The inspector saw damage to the interior of the property caused by vandalism.  Id.  Vertex noted that no remedial work had taken place in the interior of the building since its November 2019  inspection, and the interior of the property was in substantially the same condition as during the prior inspection.  Id. at 5.  Vertex recommended the removal and replacement of any  mold-impacted drywall materials,

but Vertex stated that it had not reviewed Alisha's insurance policy and it was not offering a coverage opinion. Id. at 6.

Throughout Zurich's investigation, it requested information from representatives of Alisha concerning vandalism and construction activity at the site prior to the windstorm. Dkt. # 59-9; Dkt. # 59-11; Dkt. # 59-12. In July 2019, Zurich requested copies of police reports supporting Alisha's vandalism claim and all construction records dating back to the inception of the builder's risk policy. Dkt. # 59-9, at 1. Zurich also sought records of any repairs completed as part of the 2017 tornado claim. Id. Patel responded that he would "send that ASAP," and McKay advised Zurich that he would request the information from the insured so he could forward the materials to Zurich. Id. Zurich issued the advance payment of $203,685.75 to Alisha, even though it had not received the requested information, but Zurich made the payment under a reservation of its right to deny coverage pending further investigation. Dkt. # 59-10. Zurich received police reports from Alisha on August 30, 2019, but Alisha advised Zurich that it had not obtained the construction records that it had requested. Dkt. # 59-9, at 1. Zurich reminded Alisha that the builder's risk policy excluded coverage for vandalism if there had not been any construction activity at the site within 60 days prior to the loss, and the policy provided for a 15 percent reduction for other types of covered losses based on the lack of construction activity. Id. at 2. Even though Alisha had not provided construction records to Zurich, McKay asked Zurich to issue a decision on their claim and pay mitigation costs and all damage from the windstorm. Id. at 3. As of October 23, 2019, Zurich declined to forward any more payments on the windstorm claim until it received additional information from Alisha. Id. On December 30, 2019, Zurich advised McKay and Patel that Zurich had not received construction records or any other evidence showing that any construction activity had occurred

within 60 days of the windstorm, and Zurich's adjustor, Dean, told Alisha that Zurich would likely apply exclusions and/or reductions based on the lack of construction activity.  Dkt. # 59-11, at 3.

On February 10, 2020, Dean again advised Alisha that he had not received any documents showing that construction activity took place at the hotel within 60 days of the windstorm, and he notified Alisha that he would reduce the final payment by 15 percent. Dkt. # 59-12.  Dean informed Alisha that Zurich would be relying on YA's estimate as the basis for calculating the final payment to Alisha, minus certain deductions required by the insurance policy.  Id.  The final estimate prepared by YA included payments for demolition of damaged building materials, reconstruction of damaged building materials, contractor overhead, and emergency board up services.   Dkt. # 59-13, at 2.  However, the estimate excluded costs incurred due to code upgrades, hazardous material abatement, and city permit and engineering fees.  Id.  YA's final estimate for repairs to the property was $1,321,900.39, which was reduced by $97,309.72 for depreciation and additional 15 percent under the ongoing construction provision of the policy.  Id. at 13.  Zurich issued a final payment of $828,716.33 to Alisha.  Id. at 16.  Repairs to the hotel have not been completed and the property is currently subject to a condemnation order issued by the City of Tulsa.  Dkt. # 59-14.

Alisha disputes that Zurich has made all payments required under the builder's risk policy, and has provided several damages estimates by McKay in support of its claim for additional funds under the policy.  McKay inspected the property on May 29, 2019, four days after the windstorm, and took photographs documenting damage to the property.  Dkt. # 68-1, at 9-10.  He conducted a second inspection of the property on June 18, 2019, and a Zurich adjuster was present during this inspection. Dkt. # 25, at 3; Dkt. # 68-1, at 11.  McKay states that the roof of the property had been properly repaired following the 2017 tornado, even if the repairs were incomplete as of May 25,

2019. Dkt. # 68-1, at 11. McKay noted that water was migrating from the roof into the interior of the hotel and there were obvious signs of vandalism. Id. McKay prepared an estimate (Dkt. # 68-1, at 51-407) stating that it would take $4,637,205.38 to restore the hotel to its pre-loss condition. McKay subsequently produced revised estimates of $4,256.829.71 and $3,942.281.80 to remove certain items of damages caused by vandalism or that were attributable to the 2017 tornado. Id. at 12. McKay reduced his third estimate from $3,942,281.80 to $3,717.854.11 to account for the actual cash value of the property when the storm occurred. McKay testified in his deposition that he used YA's January 2019 report to determine the condition of the property when the windstorm occurred in May 2019, because it appeared that little or no construction activity had occurred in the interim. Dkt. # 59-2, at 9-10. McKay relied on the January 2019 condition of the property as a "starting point," and he did not initially consider whether certain repairs were covered as part of the 2017 tornado claim. Id. at 10. McKay assumed that water damage to the drywall in the interior of the building was caused by the 2019 windstorm, not the act of vandals seeking to remove pipes from inside the walls, even though he acknowledged that the removal of pipes could potentially cause water damage. Id. at 12-14.

Alisha filed this case in Tulsa County District Court alleging claims of breach of contract and bad faith against Zurich. Zurich removed the case to this Court on the basis of diversity jurisdiction and, after pretrial discovery was completed, Zurich filed a motion for summary judgment (Dkt. # 59). Zurich argues that Alisha cannot prevail on its breach of contract claim, because Alisha has not met its burden to show that its damages were actually caused by the 2019 windstorm. Zurich also argues that certain types of damages are not covered by the builder's risk policy, such as vandalism, damage attributable to the 2017 tornado, and code-related costs. Zurich also argues that the damages should

be reduced to the actual cash value of the building, rather than the replacement cost, and that Alisha

failed to mitigate its damages by performing necessary repairs following the 2017 tornado.  Alisha

filed a response (Dkt. # 68) to the motion for summary judgment and included a fourth estimate by

McKay concerning Alisha's damages.  McKay's new estimate reduces Alisha's claimed damages

from $3,717,854.11 to $3,370,405.43, both stated in terms of actual cash value. Dkt. # 68-1, at 12-

13.  McKay states that he is removing additional items from his estimate that are not related to the

May 25, 2019 windstorm or are not covered by the policy, and he claims he corrected a scrivener's

error concerning the cost of packaged terminal air conditioning (PTAC) units.  Id. at 13-14.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine

dispute as to any material fact and the moving party is entitled to judgment as a matter of law.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993).  The plain language of

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion, against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex, 477 U.S. at 317.  "Summary judgment procedure is properly regarded not as a disfavored

procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy and inexpensive determination of every action.'"  Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more

than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there

is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (citations omitted).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252.  In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Id.</u> at 250.  In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. <u>Garratt v. Walker</u>, 164 F.3d 1249, 1251 (10th Cir. 1998).

**III.**

Zurich argues that it paid Alisha all amounts owed under the builder's risk policy for damage to the hotel that was proximately caused by the May 25, 2019 windstorm, and Alisha has not met its burden to show that any additional amounts are covered by the policy.  Dkt. # 59, at 5.  Zurich also argues that certain types of damages, such as code-related costs and damage caused by Alisha's failure to mitigate, are not covered by the policy.  <u>Id.</u>  Should the Court find that summary judgment is inappropriate on Alisha's breach of contract claim, Zurich argues that there is a legitimate dispute between the parties concerning Alisha's demand for additional amounts under the policy, and Zurich cannot be held liable for bad faith.  <u>Id.</u> at 6.  Alisha responds that Zurich's estimate of approximately $1.3 million for damage to the hotel was arbitrary and based on an inadequate investigation, and Alisha asserts that Zurich should have accepted the "accurate" estimate provided by Alisha's representative, McKay, after he inspected the property in May and June 2019.  Dkt. # 69, at 20-21.  Alisha argues that Zurich breached the insurance contract and acted in bad faith by underpaying the

12

claim, conducting an inadequate investigation, and delaying in making a payment on Alisha's windstorm damage claim.  Id.

### A.

Before reaching Zurich's motion for summary judgment, the Court will consider Zurich's request to strike statements in McKay's declaration and his previously undisclosed fourth estimate of Alisha's damages caused by the 2019 windstorm.  Zurich asks the Court to strike statements in McKay's declaration and his fourth revised estimate of Alisha's damages, because these materials were not produced during pretrial discovery and were prepared after the filing of Zurich's motion for summary judgment. Dkt. # 70.  McKay previously prepared three estimates of Alisha's damages as a result of the 2019 windstorm, and he appeared to take the position during his deposition that he either could not or was not obligated to determine the cause of different aspects of Alisha's damages. McKay has prepared a fourth estimate that was attached to Alisha's response (Dkt. # 68) to Zurich's motion for summary judgment, and McKay deducts certain amounts that he now claims were either scrivener's errors or were not covered under the builder's risk policy.  Alisha argues that McKay has merely clarified or corrected his prior opinions, and Zurich will not be prejudiced by the Court's consideration of McKay's fourth estimate of damages or his revised opinions as stated in his declaration. Dkt. # 72. Zurich also asks the Court to strike the declaration of Pete Scaffidi, the chief executive officer of UDR, concerning Alisha's mitigation damages, because the declaration is allegedly "self-serving" and "conclusory."  Dkt. # 70, at 8-10.

The Federal Rules of Civil Procedure require an expert witness to prepare a report containing a "complete statement of all opinions to be expressed and the basis and reasons for them . . . ." Fed. R. Civ. P. 26(a)(2)(B).  A party's failure to disclose the identity of an expert witness or provide a

timely expert report requires the court to automatically exclude expert testimony unless the violation of Rule 26(a)(2) was justified or was harmless under the circumstances.  Fed. R. Civ. P. 37(c)(1); Jacobsen v. Deseret Book Co., 287 F.3d 936, 951-52 (10th Cir. 2002).  A court may exclude specific opinions or bases for the expert's opinions that were not fairly disclosed in the expert's report. Keach v. United States Trust Co., 419 F.3d 626, 641 (7th Cir. 2005).  The Tenth Circuit has identified four factors to determine whether a violation of Rule 26(a)(2) was harmless or justified: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.  Woodworker's Supply, Inc., v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999).  Under Rule 26 (a)(2)(D)(ii), any expert evidence that "is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)" must be exchanged within 30 days after the opposing party's disclosure.  In contrast to rebuttal expert evidence, a party is required to supplement expert disclosures under Rule 26(e) "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect . . . ."  Fed. R. Civ. P. 26(e)(1)(A).  A party must supplement its expert disclosures "by the time the party's pretrial disclosures under Rule 26(a)(3) are due."

Under Rule 26(e), a party is under a duty to supplement "in a timely manner if the party learns that in some material respect the disclosure is incomplete or incorrect and if the additional and corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . ."  Rule 26(e)(1) does not permit parties to produce "supplemental reports whenever they believe such reports would be 'desirable' or 'necessary' to their case," and

supplemental reports are permitted "(1) upon court order; (2) when the party learns that the earlier information is inaccurate or incomplete; or (3) when answers to discovery requests are inaccurate or incomplete." Minebea Co., Ltd. v. Papst, 231 F.R.D. 3, 6 (D.D.C. 2005). Although parties are permitted to supplement expert disclosures, Rule 26(e) "does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." Leviton Mfg. Co., Inc. v. Nicor, Inc., 2007 WL 1306759 *4 (D.N.M. April 20, 2007) (quoting Beller v. United States, 221 F.R.D. 696, 701 (D.N.M. 2003)). As one court has noted:

> A supplemental expert report that states additional opinions or rationales or seeks to "strengthen" or "deepen" opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under Rule 37(c)(1). "To rule otherwise would create a system where preliminary [expert] reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given. This result would be the antithesis of the full expert disclosure requirements stated in Rule 26(a).

Cook v. Rockwell Int'l Corp., 2006 WL 3533049 *87 (D. Colo. Dec. 7, 2006) (citations omitted). Permitting late supplementation of expert reports also has the effect of denying the opposing party the opportunity to file a meaningful Daubert motion as to questionable expert testimony. See Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Public Schools, 455 F. Supp. 2d 1286, 1299 (D.N.M. 2006).

Prior to the filing of this case, McKay produced an estimate stating that Zurich was obligated to pay $4,637,205.38 to fully compensate Alisha for damage caused by the 2019 windstorm. Dkt. # 68-1, at 12. McKay produced a second estimate in March 2022 reducing his estimate from $,4,637,205.38 to $4,256,829.71, and he was deposed by Zurich's counsel in July 2022. McKay testified that his initial approach was simply to assess the condition of the property as he found it

after the May 2019 windstorm, and he compared that to the condition of the property as described in YA's January 2019 report.  Dkt. # 59-2, at 9.  McKay's deposition testimony suggests that he initially made little attempt to distinguish whether certain elements of damages were caused by the 2017 tornado, vandalism, or the 2019 windstorm.  In September 2022, McKay provided a third estimate further reducing his assessment of Alisha's potential damages to $3,942,281.80, reduced to $3,717,854.11 in actual cash value.  Dkt. # 68-1, at 774-1130.  Zurich filed its motion for summary judgment on December 9, 2022, and Zurich relied on McKay's third estimate and his deposition testimony as the basis for its argument that Alisha failed to meet its burden to distinguish between different potential causes of damage.  Alisha subsequently filed a response to Zurich's motion for summary judgment, and Alisha attached a new and previously undisclosed fourth estimate by McKay further reducing his estimate of Alisha's damages.

Zurich argues that McKay's fourth estimate of Alisha's damages is not based on any new evidence, and Alisha should have provided Zurich with a copy of the new estimate before the discovery cutoff expired.  Dkt. # 70, at 3-5.  Alisha does not respond to the argument that its fourth damages estimate was untimely, but it does argue that Zurich will not be prejudiced if the Court considers a new damages estimate that merely corrects or clarifies a previously disclosed expert opinion.  Dkt. # 72, at 7-13.  The Court finds that Alisha has essentially provided no explanation for its delay in producing McKay's fourth estimate to Zurich, but Zurich has failed to show that it will actually be prejudiced if Alisha is permitted to use the estimate in support of its claims.  McKay's fourth estimate essentially concedes that Alisha cannot recover certain types of damages as part of its windstorm damage claim, and he is not asserting that Alisha is entitled to additional damages that had not previously been disclosed in discovery.  McKay's fourth estimate effectively concedes that

16

certain elements of damages identified in Zurich's motion for summary judgment are not covered by the builder's risk policy.[4]  Zurich has not shown that it will be required to conduct additional discovery in light of McKay's fourth estimate, and the estimate will also not support the existence of any issue of disputed fact that would not have been present without the new estimate.  While Alisha should have disclosed McKay's new estimate in a more timely fashion, the Court does not find that Zurich will be prejudiced by the Court's consideration of the new estimate when ruling on Zurich's motion for summary judgment, and Zurich's request to strike McKay's fourth estimate and certain statements in McKay's declaration is denied.

Zurich also asks the Court to strike Pete Scaffidi's declaration concerning mitigation costs, because the declaration is "self-serving" and conclusory.  Dkt. # 70, at 8.  Scaffidi states that he is the chief executive officer of Unified Disaster Resources (UDR), and he specializes in evaluating water damage to buildings to determine the scope of mitigation and repair.  Dkt. # 68-1, at 1747.  Alisha hired UDR as a restoration contractor following the 2019 windstorm, and UDR proposed a budget of $815,824.99 to mitigate water damage caused by the windstorm.  Id. at 1748.  In August 2020, UDR prepared a revised estimate based on new information and the mitigation budget was increased to $875,929.86.  Id.  The Court declines to strike Scaffidi's declaration, and the issues raised by Zurich are more appropriate for cross-examination if Scaffidi should testify at trial.  The fact that Scaffidi's declaration is favorable to Alisha does not make it impermissibly "self-serving,"

---

[4]     In light of McKay's concessions, the Court finds that it unnecessary to consider Zurich's arguments that specific items of damages are excluded from coverage under the policy.  See Dkt. # 59, at 21-26.  Zurich may raise specific damages issues in a motion in limine if Zurich believes that McKay's fourth estimate does not concede each issue raised in Zurich's motion for summary judgment.  However, these are fact intensive issues and will likely be reserved for the jury, and such a motion should be filed only if the facts concerning the issue are clearly undisputed.

as nearly every affidavit or declaration submitted by a party tends to seem "self-serving" from the perspective of the opposing party. Scaffidi's declaration states that he was asked to prepare a mitigation budget, and he does not suggest that he was asked to differentiate between different potential causes of damage or that all of the damage was attributable to the May 25, 2019 windstorm. UDR's mitigation budgets are sufficiently supported by documentary evidence explaining the need for mitigation work, and the Court finds no basis to strike Scaffidi's declaration from the summary judgment record.

## B.

Zurich argues that Alisha cannot meet its burden to show that any amount of damages it seeks beyond what has already been paid by Zurich was proximately caused by the 2019 windstorm, and Zurich seeks summary judgment on Alisha's breach of contract claim. Dkt. # 59, at 19-20. Alisha responds that it promptly conducted an inspection of the property following the windstorm and provided an accurate summary of the damage caused by the windstorm to Zurich, and Alisha claims that Zurich's own inspection of the property confirmed the accuracy of Alisha's initial investigation. Dkt. # 68, at 20. Alisha argues that Zurich refused to pay all covered damages caused by the windstorm, and its eventual and untimely payment of approximately $1,300,000 was arbitrary and insufficient under the builder's risk policy. Id. at 20-21.

Under Oklahoma law, "[a] breach of contract is a material failure of performance of a duty arising under or imposed by agreement." Lewis v. Farmers Ins. Co., 681 P.2d 67, 69 (Okla. 1983). The three elements of a breach of contract claim are "1) formation of a contract; 2) breach of the contract; and 3) damages as a direct result of the breach." Digital Design Grp., Inc. v. Info. Builders, Inc., 24 P.3d 834, 843 (Okla. 2001). Insurance policies are contracts and are interpreted in

18

accordance with the general principles of contract law.  May v. Mid-Century Ins. Co., 151 P.3d 132,

140 (Okla. 2006).  "A contract must be considered as a whole so as to give effect to all its provisions

without narrowly concentrating upon some clause or language taken out of context."  Lewis v. Sac

& Fox Tribe of Okla. Housing Auth., 896 P.2d 503, 514 (Okla.1994).  "The terms of the parties'

contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary sense, and

the contract will be enforced to carry out the intention of the parties as it existed at the time the

contract was negotiated."  Dodson v. St. Paul Ins. Co., 812 P.2d 372, 376 (Okla.1991); see also

OKLA. STAT. tit. 15 § 160.

In January 2019, YA inspected the insured property to determine the status of repairs

following a 2017 tornado, and the primary finding from the inspection was that repairs were ongoing

but substantially incomplete.  Windows and doors were boarded up, plumbing and electrical fixtures

had not been installed, and no flooring had been installed on any floor of the hotel.  Dkt. # 68-1, at

1698.  The insured, Patel, represented that repairs were approximately 50 percent complete.  Id. at

1699.  The windstorm occurred on May 25, 2019, and Alisha retained Pinnacle to assist it with the

resolution of a potential insurance claim.  McKay conducted his initial investigation on May 29,

2019, and Alisha filed vandalism and storm damage claims on June 10, 2019.  Zurich sent an

inspector to the property to conduct an inspection on June 18, 2019, and the inspector noted that

repairs to the roof and exterior were underway but not completed at the time of the windstorm.  Id.

at 1710.  Approximately 75 percent of the rooms suffered extensive water damage after the new but

incomplete roof blew off during the windstorm, and the inspector stated that the new roof had not

been properly installed.  Id.  No construction activity had taken place at the hotel since January 2019,

and the adjuster noted that the lack of construction activity and the unoccupied status of the building

could affect insurance coverage.  Id.  Zurich retained YA and Vertex to assess the damage to the insured property, and additional inspections took place over the next six months.  YA estimated that Alisha suffered a loss of approximately $1.3 million that could be attributed to the 2019 windstorm.  McKay prepared an estimate on behalf of Alisha, and he claimed that Alisha was owed over $4.6 million under the builder's risk policy.  Zurich requested police reports and construction records from Alisha to properly evaluate Alisha's vandalism claim.  Alisha was ultimately able to produce police reports in support of its vandalism claim, but Alisha could not produce any evidence of ongoing construction activity within 60 days of the windstorm.  Dkt. # 59-9, at 1.  Zurich ultimately found that Alisha's windstorm damage claim was covered by the builder's risk policy, and Zurich relied on YA's estimate of approximately $1.3 million to resolve the claim.

Zurich is correct that Alisha initially made little or no effort to show that certain items of damages were caused by the 2019 windstorm, and Alisha's expert, McKay, simply estimated Alisha's damages based on the condition of the property at the time of his inspection.  McKay failed to give adequate consideration to the 2017 tornado and Alisha's own admission that some of the damage to the property was caused by vandalism.  However, viewing the evidence in a light most favorable to Alisha, the Court finds that there is a genuine dispute of material fact as to the full amount owed to Alisha on its claim for damages related to the 2019 windstorm.  Oklahoma law does place the initial burden on the insured to show that it has a covered loss, and there is no dispute that Alisha has met this burden.  See Cherokee Nation v. Lexington Ins. Co., 521 P.3d 1261, 1267 (Okla. 2022).  Zurich argues that Alisha has an additional burden of establishing that each element of damages sought by Alisha was proximately caused by the 2019 windstorm.  Dkt. # 59, at 19.  The cases cited by Zurich do not explain what burden is placed on an insured after it makes an initial

showing that it suffered a covered loss and, at this stage of the case, it is unnecessary for the Court to resolve what burden is on Alisha to show that specific damages are covered under the policy. Zurich has shown that the 2017 tornado, ongoing vandalism, and the 2019 windstorm are potential causes of damage to Alisha's property, and Alisha must make some attempt to show that specific damages are related to the 2019 windstorm in order to recover on its breach of contract claim. This does not mean that the Alisha has a burden to show with absolute certainty that specific items of damages were caused by the 2019 windstorm, rather than the 2017 tornado or vandalism. A reasonable jury could conclude that Alisha is entitled to some additional amount of recovery on its insurance claim, beyond the amounts already paid by Zurich, and Zurich is not entitled to summary judgment on Alisha's breach of contract claim.

## C.

Zurich argues that the evidence shows that there is a legitimate dispute between the parties concerning the amount of the loss resulting from the May 25, 2019 windstorm, and Zurich claims that it conducted a reasonable investigation in an effort to resolve Alisha's windstorm damage claim. Dkt. # 59, at 27-29. Alisha responds that Zurich significantly underpaid Alisha's insurance claim from the May 25, 2019 windstorm based on an inadequate investigation, and Alisha argues that Zurich's unreasonable delay in paying the claim caused additional harm by preventing Alisha from reopening the hotel in a timely manner. Dkt. # 68, at 25-29.

The Oklahoma Supreme Court has held that "an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive, damages may be sought." Christian v. Am. Home. Assurance Co., 577 P.2d 899, 904 (Okla. 1977). "The core of a bad-faith claim 'is the

insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy.'" Flores v. Monumental Life Ins. Co., 620 F.3d 1248, 1255 (10th Cir. 2010) (quoting McCorkle v. Great Atl. Ins. Co., 637 P.2d 583, 587 (Okla. 1981)).  To succeed on a bad faith claim, plaintiffs "must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of [plaintiffs'] claim." Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1436 (10th Cir. 1993); accord Shotts v. GEICO Gen. Ins. Co., 943 F.3d 1304, 1314 (10th Cir. 2019).  According to the Tenth Circuit, courts generally use a two-step analysis to determine whether a plaintiff has made a sufficient showing of bad faith.  Shotts, 943 F.3d at 1314-15.  The Court considers 1) "whether there is a legitimate dispute between the insurer and the insured regarding coverage or the value of the claim"; and 2) "if the court determines there is a legitimate dispute between the parties, . . . whether the plaintiff offered specific additional evidence to demonstrate bad faith." Id. at 1315.  "The additional evidence required for this showing" may include evidence that 1) "the insurer did not *actually* rely on th[e] legitimate [dispute] to deny coverage"; 2) the insurer "denied the claim for an illegitimate reason"; 3) the insurer "otherwise failed to treat the insured fairly"; and 4) "the insured performed an inadequate investigation of the claim." Id. (internal quotations and citations omitted) (emphasis and alterations in Shotts, 943 F.3d at 1315).

The Court will initially consider whether there was a legitimate dispute between the parties regarding the value of Alisha's insurance claim.[5]  The incident giving rise to Alisha's claim took

---

[5]     Alisha relies on cases decided by the Oklahoma Supreme Court and the Oklahoma Court of Civil Appeals to argue that the reasonableness on an insurer's decision to dispute coverage is nearly always a question of fact for the jury. Dkt. # 68, at 27.  However, these decisions are based on Oklahoma's summary judgment standard, not Fed. R. Civ. P. 56, and the cases cited by Alisha have no bearing on the standard of review that should be applied by this

place on May 25, 2019, and Alisha filed a claim with Zurich on June 10, 2019.  Zurich promptly

conducted a site inspection after receiving notice of Alisha's vandalism and storm damage claims,

and Zurich retained YA and Vertex as consultants.  Zurich conducted an initial site investigation on

June 18, 2019, and the adjustor observed extensive damage caused by vandalism that appeared to

have taken place prior to the windstorm.  Dkt. # 68-1, at 1717.  YA and Vertex performed their own

investigations in July and August 2019.  YA observed extensive damage to the hotel, but much of

the damaged property fell within the scope of the prior claim for the 2017 tornado.  Dkt. # 59-6, at

2.  Many of the repairs from the 2017 tornado had not been completed by Alisha, and YA's estimate

for damage caused by the 2019 windstorm did not include any amounts for incomplete repairs from

the 2017 tornado.  Id.  Vertex determined that the nails used to secure  the TPO roof to the structure

were inadequate and water entered the hotel after the uplift forces of the storm caused the roof to fail.

Dkt. # 59-7, at 6-7.  Vertex recommended temporary repairs to the roof and Alisha received an

advance payment of over $200,000 to make temporary repairs.  Zurich requested police reports about

alleged vandalism and records showing whether any construction activity had taken place within 60

days of the windstorm.  Dkt. # 59, at 9-10; Dkt. # 68, at 7.  Zurich had to request this evidence

several times as Alisha failed to respond to Zurich's requests, and Alisha was ultimately unable to

produce any evidence that construction activity had been ongoing at the time of the windstorm.

Zurich issued a final payment of $828,716.33 to Alisha, but Alisha contends that it is owed

substantially more to fully resolve its windstorm damage claim.

   The primary evidence supporting Alisha's assertion that Zurich acted in bad faith by

underpaying the windstorm damage claim are McKay's damages estimates.   Alisha describes

_____

Court when evaluating Zurich's motion for summary judgment.

McKay's estimates as an accurate representations of its damages, and Alisha claims that its investigation "determined the nature, timing, and scope of the damage to the Property, differentiating among windstorm-related damage, vandalism-related damage, and pre-existing damage." Dkt. # 68, at 20. The mere fact that Zurich failed to accept McKay's recommendations concerning the full amount of Alisha's loss does not tend to show that Zurich acted in bad faith. The Oklahoma Supreme Court has been clear that "there can be disagreements between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions," and the tort of bad faith does not apply when an insurer reasonably chooses to withhold payment or litigate a legitimate coverage dispute. Porter v. Oklahoma Farm Bureau Mut. Ins. Co., 330 P.3d 511, 518 (Okla. 2014). Zurich's decision to reject McKay's initial estimate is well-supported of in light of McKay's frequent revisions to his initial damages estimate, and McKay has continued to revise his damages estimate even after the filing of Zurich's motion for summary judgment. McKay initially gave little weight to the different potential causes of damage to the hotel, and he demanded that Zurich pay Alisha's windstorm damage before Zurich had completed its investigation. Dkt. # 59-9, at 1. Zurich's rejection of McKay's initial estimate was reasonable under the circumstances and does not show that Zurich acted in bad faith.

Alisha also argues that Zurich acted in bad faith by conducting an inadequate investigation. Alisha argues that Zurich overlooked or intentionally failed to consider the following categories of evidence when determining the amount of the loss: (1) evidence concerning the status of repairs from the 2017 tornado; (2) evidence establishing that certain acts of vandalism occurred after the May 2019 windstorm; and (3) evidence of category 3 water exposure that would have required removal and replacement of items. Dkt. # 68, at 27. The evidence establishes that Zurich was aware of the

January 2019 report by YA documenting the status of repairs to the property caused by the 2017 tornado. YA performed the January 2019 assessment of the status of repairs to the hotel, and Zurich also retained YA to serve as the building consultant following the 2019 windstorm. Dkt. # 59-6, at 2. YA's consultant, Robert Gattenby, had clearly reviewed the January 2019 report when he prepared his estimate for covered damage to the property following the 2019 windstorm. Gattenby specifically recommended that damage to windows, stucco, doors, and door frames be excluded from coverage, because these items were paid for by Zurich as part of the 2017 tornado claim. Id. Alisha argues that Zurich should have found that acts of vandalism only occurred after the May 25, 2019 windstorm, and this is primarily based on McKay's assessment that vandalism occurred between his May 29, 2019 and June 18, 2019 inspections. However, Lindley conducted his investigation on June 18, 2019 as well, and he noted that vagrants appeared to have been living inside the hotel for a substantial period of time. Dkt. # 68-1, at 1717. Lindley's report suggests that the vagrancy preceded the 2019 windstorm, and he makes a distinction between pre-storm and post-storm acts of vandalism. Id. At a minimum, there is disputed evidence concerning the timing of acts of vandalism, and Zurich conducted a reasonable investigation into this issue. Finally, Alisha argues that Zurich failed to investigate Category 3 water damage that would have necessitated removal and replacement of certain building components. The evidence shows that Zurich was well aware of the severity of the damage, but the primary issue in this case is the cause, not the severity, of damage to the hotel. This argument does not tend to show that Zurich's investigation was inadequate or the Zurich purposefully or negligently ignored covered damage to the property.

The Court finds that Zurich is entitled to summary judgment on Alisha's bad faith claim. Zurich has shown that it had a legitimate basis to dispute the amount owed to Alisha on its claim for

damage caused by the May 25, 2019 windstorm.  The parties' dispute is primarily based on Zurich's reliance on YA's estimate of $1.3 million for covered damage to Alisha's property and Alisha's assertion that McKay's various estimates of its damages are more accurate.  The Court has determined that this issue should be resolved by a jury as to Alisha's breach of contract claim, but the evidence is more than sufficient to give rise to a legitimate coverage dispute for the purpose of a bad faith claim.  Alisha's disputes with the adequacy of Zurich's investigation have more to do with Zurich's decision as to the amount ultimately paid to resolve Alisha's claim, rather than the investigation itself, and there is no evidence tending to show that Zurich intentionally ignored or overlooked relevant issues in terms of its investigation.  Concerning Alisha's assertion the Zurich delayed in making payment on the claim, much of the delay was attributable to Alisha's failure to produce police reports and construction records, and Zurich's decision to give Alisha additional time to produce these records was not an act of bad faith.

**IT IS THEREFORE ORDERED** that Defendant American Zurich Insurance Company's Motion for Summary Judgment and Brief in Support (Dkt. # 59) is **granted in part and denied in part**: the motion is granted as to Alisha's bad faith claim and denied as to Alisha's breach of contract claim.

**IT IS FURTHER ORDERED** that Defendant American Zurich Insurance Company's Motion to Strike Portions of Jett McKay's and Pete Scaffidi's Declarations and Untimely Submitted Pinnacle Estimate (Dkt. # 70) is **denied**.

**IT IS FURTHER ORDERED** that the parties are directed to file an updated joint status report no later than **July 24, 2023**.

**DATED** this 13th day of July, 2023.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE

27